ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| **FERNANDO R. VARGAS MELÉNDEZ**<br><br>Recurrido<br><br>v.<br><br>**EMERSON PUERTO RICO, INC. y EMERSON AUTOMATION SOLUTIONS**<br><br>Peticionarios | KLCE202401217 | **CERTIORARI** procedente del Tribunal de Primera Instancia, Sala Superior de **Bayamón**<br><br>Civil Núm.: **BY2021CV02073**<br><br>Sobre: Despido Injustificado y Discrimen en el Empleo |

Panel integrado por su presidenta, la Jueza Ortiz Flores, la Jueza Aldebol Mora y la Jueza Boria Vizcarrondo.

Boria Vizcarrondo, Jueza Ponente.

## RESOLUCIÓN

En San Juan, Puerto Rico, a 22 de enero de 2025.

Comparece ante nos, mediante *Petición de Certiorari* presentado el 7 de noviembre de 2024, Emerson Puerto Rico, Inc. (Emerson PR, Compañía o Peticionario) y nos solicita que revoquemos la *Resolución* dictada el 11 de octubre de 2024 por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI).[1] En virtud del referido dictamen, el TPI denegó la *Solicitud de Sentencia Sumaria* presentada por Emerson PR,[2] al entender que el Peticionario no presentó prueba para refutar las presunciones establecidas a favor del señor Fernando R. Vargas Meléndez (Sr. Vargas Meléndez, Querellante o Recurrido), por un alegado despido injustificado por motivos discriminatorios, presentados en la *Querella*.[3] El TPI también estimó que Emerson PR no logró

---

[1] Apéndice de *Petición de Certiorari*, Anejo XXXIII, págs. 1323-1340. Notificada y archivada en autos el 11 de octubre de 2024.
[2] *Íd*., Anejo XX, págs. 65-596.
[3] *Íd*., Anejo I, págs. 1-4.

Número Identificador
RES2025 _____

demostrar algún motivo administrativo para el despido del Sr. Vargas Meléndez, pues no presentó prueba que demuestre alguna pérdida económica seria.

Por los fundamentos discutidos a continuación, denegamos expedir el auto de *Certiorari* presentado.

**I.**

A continuación, haremos un resumen de los hechos pertinentes que el TPI estimó incontrovertidos:

1. Emerson EC es la empresa matriz que tiene varias subsidiarias alrededor del mundo, entre ellas, la Peticionaria, Emerson PR.

2. En el 2017, Emerson EC adquirió Pentair Valves and Controls (Pentair), patrono en aquel entonces del Sr. Vargas Meléndez.

3. El Sr. Vargas Meléndez fue el único empleado de Pentair que fue contratado por Emerson PR.

4. Para el 1 de noviembre de 2017, el Sr. Vargas Meléndez tenía 49 años.

5. Al momento de la adquisición, el Sr. Vargas Meléndez ocupaba el puesto de Sales Manager II.

6. Como Sales Manager II, el Sr. Vargas Meléndez vendía actuadores (aparato que hace que una válvula abra o cierre) en Latinoamérica.

7. El Sr. Vargas Meléndez trabajaba remoto desde su casa en Trujillo Alto, Puerto Rico y a veces se personaba en las oficinas de Emerson PR, ubicadas en Guaynabo, Puerto Rico.

8. Dentro de Emerson PR, el Sr. Vargas Meléndez pertenecía a la división de Actuation Technologies.

9. Las siguientes personas ocuparon puestos dentro de Emerson EC:

   a. El señor John Faulkinberry (Sr. Faulkinberry), Vice-President of Sales Americas.

    b. El señor Orlando Santiago Alicea (Sr. Santiago Alicea), Gerente General de Emerson PR para el Norte de Latinoamérica.

    c. El señor Daniel Quintero (Sr. Quintero), Director de Ventas para Latinoamérica, ubicado en Houston, Texas y trabajaba para Emerson Texas, subsidiaria de Emerson EC. Fue Supervisor del Sr. Vargas Meléndez hasta febrero de 2018.

    d. El señor Damián Trujillo (Sr. Trujillo), Latin America Sales Manager para Actuation Technologies a partir del 2018. Antes de eso, fue Sales Manager II en Colombia.

    e. La señora Gabriela Delgadillo (Sra. Delgadillo), representante de Recursos Humanos de Emerson en México, Colombia y Puerto Rico.

    f. La señora Nathalie Chida (Sra. Chida), representante de Recursos Humanos de Emerson en México, Colombia y Puerto Rico. La Sra. Chida reemplazó a la Sra. Delgadillo.

    g. El señor Gianfranco Conti (Sr. Conti), Sales Manager II en Emerson Colombia.

    h. El señor Emilio Carbone (Sr. Carbone), Sales Manager II.

    i. El señor Sebastián Ginzo (Sr. Ginzo), Sales Manager II en Emerson Argentina.

10. Los señores Vargas Meléndez, Conti, Carbone y Ginzo ocupaban el mismo puesto, pero en distintos países y con distintas regiones asignadas.

11. En su posición como Latin America Sales Manager para Actuation Technologies, el Sr. Trujillo supervisaba a los señores Vargas Meléndez, Conti, Carbone y Ginzo.

12. El Sr. Trujillo se reportaba a su jefe, el Sr. Faulkinberry.

13. El Sr. Faulkinberry era la persona con mayor jerarquía en la división de Actuation Technologies.

14. En mayo de 2018, el Sr. Trujillo convocó a los señores Vargas Meléndez, Conti, Carbone y Ginzo a una reunión para asignarles sus territorios, tareas y las metas de venta.

15. En octubre de 2019, el Sr. Ginzo fue despedido de Emerson Argentina. El Sr. Trujillo le informó que esto se debió a una reestructuración a nivel global, puesto que la región de América, bajo el mando del Sr. Faulkinberry, no había llegado al objetivo de ventas.

16. El Sr. Trujillo realizó una evaluación para determinar cuál era el área que iba a tener menos impacto en la compañía.

17. La evaluación del Sr. Trujillo concluyó que esta era el área del Sr. Vargas Meléndez.

18. El Sr. Vargas Meléndez había recibido premios y reconocimientos por su desempeño:
    a. En el 2018 por excederse en las metas de venta.
    b. En el 2018 por ser el vendedor del mayor porcentaje de ventas en Emerson.
    c. En el 2019 por ser el vendedor con mayores ventas en la región supervisada por el Sr. Trujillo.

19. El 15 de enero de 2020, el Sr. Vargas Meléndez fue despedido.

20. No se crearon puestos nuevos luego del despido del Sr. Vargas Meléndez.

21. A partir del 18 de octubre de 2018, el salario del Sr. Vargas Meléndez era $105,987.00 más bonos.

22. En el 2018, el Sr. Vargas Meléndez recibió $31,659.00 en concepto de bonificaciones.

23. El Sr. Vargas Meléndez nunca fue amonestado por Emerson EC, Emerson PR o cualquier otra subsidiaria, ni cometió alguna falta por la que pudiera ser amonestado.

24. El Sr. Vargas Meléndez tenía más experiencia en ingeniería, con los equipos que vendía (actuadores y válvulas) y con puestos gerenciales que los señores Trujillo, Conti y Carbone.

25. Los señores Trujillo, Conti y Carbone nacieron en Venezuela y son entre nueve (19) a dieciséis (16) años menores que el Sr. Vargas Meléndez.

26. El 16 de enero de 2020, a las 9:11 PM, el Sr. Trujillo envió un correo electrónico con el asunto: "Replace Fernando" que decía "Done" con un emoji de carita sonriente guiñando un ojo y sacando la lengua.

Por los hechos descritos, el 27 de mayo de 2021, el Sr. Vargas Meléndez presentó una *Querella* por despido injustificado y discrimen en el empleo al amparo de la Ley de Procedimiento Sumario de Reclamaciones Laborales, Ley Núm. 2 de 17 de octubre de 1961, según enmendada, 32 LPRA sec. 3118 *et seq.* (Ley Núm. 2) y de la Ley Sobre Despidos Injustificados, Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 LPRA sec. 185ª *et seq.* (Ley Núm. 80), en contra de Emerson PR y Emerson Automation Solutions.[4] En la *Querella*, alegó que aunque la razón que recibió por el despido fue la alegada eliminación de su plaza, señaló que:

> [E]l Querellante entiende que la razón provista fue un pretexto porque por información o creencia su despido fue injustificado y discriminatorio. Así lo entiende el Querellante porque la alegada eliminación de la plaza fue para que otro empleado llevara a cabo sus funciones sin razón legítima alguna y para favorecer a esa persona que era más joven que el Querellante. Ese empleado contaba con menos antigüedad que el Querellante en la empresa, y además era de nacionalidad venezolana, mediando como parte de la motivación para el despido favoritismo para ese empleado por su origen nacional. Además, el Querellante contaba no solamente con más experiencia y conocimientos que ese empleado para seguir llevando a cabo no solamente sus labores, pero también las labores que ese empleado estaba llevando a cabo en la medida en que la empresa hubiera decidido consolidar dos plazas en una.[5]

---

[4] *Íd.*, Anejo I, págs. 1-4.
[5] *Íd.*, pág. 3.

Además, reclamó que le habían privado de unas bonificaciones a la cuales tenía derecho cobrar por desempeño.[6] Por lo tanto, solicitó la restitución al empleo y el pago de $200,000.00 en daños y angustias mentales. El 5 de octubre de 2021, Emerson PR presentó una *Contestación a Querella Enmendada*, en la que sostuvo que el Sr. Vargas Meléndez "fue cesanteado como consecuencia de una reestructuración mediante la cual se eliminó la posición de *Sales Manager II*. Lo anterior constituye justa causa para despido de conformidad con los Artículos 2(e) y 2(f) de la Ley Núm. 80[...]".[7]

Tras varios trámites procesales, el 12 de febrero de 2024, Emerson PR presentó una *Solicitud de Sentencia Sumaria*, mediante la cual solicitó que el TPI resolviera a favor de la Compañía, al entender que no existía controversia sobre los motivos del despido del Querellante. Emerson PR alegó que este fue justificado al haber sido consecuencia de la pérdida económica que alegadamente sufrió la Compañía y la subsiguiente reorganización de la empresa, y no por razones discriminatorias. También señaló que tampoco existía controversia sobre si se realizó el pago de bonificaciones.[8]

Para esto, incluyó prueba documental para demostrar la justificación por el despido del Sr. Vargas Meléndez. En primer lugar, incluyó unas declaraciones juradas suscritas por el señor Michael J. Baughman, Vicepresidente Ejecutivo y CFO de Emerson EC, y Sr. Santiago Alicea, en las que atestaron que la empresa había sufrido una merma económica que provocó una reestructuración a nivel global.[9] En dichos procesos de reestructuración, la Compañía cesanteó a 218 empleados de la división de *Actuation Technologies*, 113 siendo de las operaciones en Estados Unidos.[10] En particular,

---

[6] *Íd.*, pág. 4.
[7] *Íd.*, Anejo V, pág. 22.
[8] *Íd.*, Anejo XX, págs. 65-596.
[9] *Íd.*, págs. 250 y 427.
[10] *Íd.*, pág. 250.

para el año fiscal que culminó el 30 de septiembre de 2019, Emerson EC y sus subsidiarias reportaron ventas netas de $18,372 millones[11] y, para el año fiscal que culminó el 30 de septiembre de 2020, ventas netas de $16,785 millones,[12] una reducción de aproximadamente 9%.

El Sr. Vargas Meléndez, por su parte, presentó una *Réplica a Solicitud de Sentencia Sumaria.*[13] Sostuvo que la *Solicitud de Sentencia Sumaria* presentada no logró refutar las causas de acción presentadas sobre discrimen por edad y nacionalidad. Señaló que el Sr. Trujillo se refería al Sr. Vargas Meléndez como "el viejo" o "el viejito" tanto en su presencia como ante terceros, a pesar de que el Sr. Vargas Meléndez expresó su disgusto por ello.[14] En varias ocasiones, el Sr. Trujillo utilizó el apodo "viejo" o "viejito" para referirse al Sr. Vargas Meléndez de manera burlona, aún luego de haberlo despedido. Según el Sr. Vargas Meléndez, esto se manifestó en que al día siguiente del Sr. Trujillo haber despedido al querellante, este le envió un correo electrónico a un distribuidor con el asunto: *Replace Fernando*, y en el área del mensaje escribió "*Done*" incluyendo un emoji de una cara sonriente guiñando el ojo y sacando la lengua.[15]

Además, señaló que hubo discrimen por nacionalidad en el despido del Sr. Vargas Meléndez al retener a los señores Carbone y Conti en sus empleos. Ambos empleados eran menores en edad, de menor antigüedad y con menos experiencia que el Sr. Vargas Meléndez, al también ambos ser venezolanos como el Sr. Trujillo.

Finalmente, aunque aceptó que Emerson PR le había pagado una cantidad en concepto de bonos por su desempeño en el 2019, alegó que no recibió la totalidad de los bonos que se le debían. Esto

---

[11] *Íd.*, pág. 440.
[12] *Íd.*, pág. 517.
[13] *Íd.*, XXI, págs. 597-696.
[14] *Íd.*, pág. 607.
[15] *Íd.*, págs. 951-952.

lo manifestó en una *Declaración Jurada* que anejó a su oposición a la sentencia sumaria.

En cuanto a la alegada merma económica, el Sr. Vargas Meléndez arguyó que esta no constituyó causa para su despido. Presentó informes financieros demostrando que Emerson EC vio aumentos en las ventas reportadas hasta el año 2019 y que en el 2020, sufrió una pérdida.[16] Destacó que aunque sí hubo pérdida en el 2020, esta se debió a los alegados efectos de la pandemia de COVID-19. No obstante, el Sr. Vargas Meléndez fue despedido en enero de 2020, antes de que comenzaran los cierres globales por causa de la pandemia en marzo de 2020. Alegó que tampoco hubo un análisis o estudio previo al despido del querellante y que Emerson EC no pudo producir uno en el descubrimiento de prueba.[17] Finalmente, alegó que al Sr. Vargas Meléndez se le debían bonos no pagados para el año 2019, que consistían en partidas: una por las metas de ventas de 2019 y otra por ventas de productos nuevos.

El 15 de abril de 2024, Emerson PR presentó una *Solicitud de Desglose* en la que solicitó que se desglosara la *Réplica a la Solicitud de Sentencia Sumaria* por incumplir con la Regla 36 (b) de Procedimiento Civil, 32 LPRA Ap. V, R. 36 (b) o, en la alternativa, permitirle a la Compañía a presentar una oposición al escrito, específicamente con relación a los noventa y un (91) hechos adicionales presentados por el Sr. Vargas Meléndez.[18] Tras varias comparecencias, el 16 de mayo de 2024, el TPI declaró No Ha Lugar a lo solicitado en la *Solicitud de Desglose*.

El 3 de junio de 2024, Emerson PR presentó una *Solicitud de Reconsideración* en la que le solicitó al TPI que le permitiera

---

[16] *Íd.*, pág. 608.
[17] *Íd.*, pág. 609.
[18] *Íd.*, Anejo XXII, págs. 997-1005.

presentar una oposición a los noventa y un (91) hechos adicionales presentados por primera vez en la *Réplica a Solicitud de Sentencia Sumaria.*[19] El 4 de junio de 2024, el TPI la declaró No Ha Lugar.[20]

Así las cosas, el 11 de octubre de 2024, el TPI notificó la *Resolución* denegando la *Solicitud de Sentencia Sumaria* presentada por Emerson PR.[21] Luego de hacer un listado de los hechos que estimó incontrovertidos, concluyó que no procedía la resolución de la controversia por la vía sumaria puesto que existía controversia sobre hechos materiales y pertinentes a la médula del caso. En particular, estimó que existía controversia sobre si:[22]

1. El Sr. Vargas Meléndez fue despedido injustificadamente, y si este fue objeto de discrimen por su edad o nacionalidad.

2. Si, a pesar de que las entidades subsidiarias de Emerson EC están incorporadas en otros países, para efectos contributivos y de nómina, en la práctica estas subsidiarias mantienen operaciones interrelacionadas, mezclan la administración, ventas, los asuntos del personal está centralizado y ejecutan las políticas laborales desde Emerson México, y si para efectos prácticos la división de North of Latin America actúa como una sola empresa en sus actividades de ventas.

3. Si se le adeuda alguna bonificación o bonificación parcial al señor Vargas.

4. Si el señor Vargas, de haber sido discriminado, ¿a cuánto ascienden los daños?

5. ¿Cuál fue el análisis que realizó el señor Trujillo para despedir al señor Vargas? [A] pesar de que este querellante tenía más antigüedad, experiencia y conocimientos en el área que este supervisaba que los señores Carbone y Conti, y que, al menos, en el 2018, este querellante haber recibido el premio del empleado que más ventas y desempeño obtuvo.

El TPI concluyó que:

---

[19] *Íd.*, Anejo XXXI, págs. 1313-1320
[20] *Íd.*, Anejo XXXII, págs. 1321-1322.
[21] *Íd.*, Anejo XXXIII, págs. 1323-1340.
[22] *Íd.*, pág. 1331.

[N]o hay dudas de que el señor Vargas era la persona con mayor experiencia, antigüedad y conocimiento en la división en la que este trabajaba. [...] Tampoco hay dudas de que los señores Carbone y Conti llevaban a cabo las mismas funciones que el señor Vargas y que ambos, al igual que el señor Trujillo, eran de nacionalidad venezolano, y eran menores que el querellante. [...] Aun así, el señor Trujillo determinó que, según se alega, se solicitaba de la matriz de Emerson que era necesario despedir a alguien y sin explicación o motivo que surja del expediente y, en ese momento, determinó despedir al señor Vargas.

También, debemos señalar que realmente Emerson PR no establece un motivo administrativo, pues no presenta prueba que demuestre alguna pérdida económica seria. [...].[23]

Inconforme, el 7 de noviembre de 2024, Emerson PR presentó el recurso de *Certiorari* ante nuestra consideración. Mediante el mismo, hizo los siguientes señalamientos de error:

**EL TRIBUNAL DE PRIMERA INSTANCIA ERRÓ AL NO PERMITIR QUE EMERSON PR REPLICARA LA OPOSICIÓN A SOLICITUD DE SENTENCIA SUMARIA QUE PRESENTÓ EL QUERELLANTE DONDE ÉSTE INCLUYÓ 91 HECHOS ADICIONALES.**

**EL TRIBUNAL DE PRIMERA INSTANCIA ERRÓ AL NO ENCONTRAR COMO INCONTROVERTIDOS MÚLTIPLES HECHOS PROPUESTOS POR LA COMPAÑÍA SOBRE LOS CUALES NO EXISTE CONTROVERSIA Y ESTÁN BASADOS EN PRUEBA ADMISIBLE.**

**EL TRIBUNAL DE PRIMERA INSTANCIA ERRÓ AL NO DESESTIMAR LA CAUSA DE ACCIÓN DE DESPIDO INJUSTIFICADO Y DISCRIMEN CUANDO LOS HECHOS INCONTROVERTIDOS PRESENTADOS POR EMERSON DEMUESTRAN QUE EL SR. VARGAS FUE DESPEDIDO JUSTIFICADAMENTE SIN NINGÚN TIPO DE ÁNIMO DISCRIMINATORIO.**

**EL TRIBUNAL DE PRIMERA INSTANCIA ERRÓ AL NO DESESTIMAR LA CAUSA DE ACCIÓN DE COBRO POR BONOS DE DESEMPEÑO CUANDO LOS DOCUMENTOS Y EL PROPIO TESTIMONIO DEL SR. VARGAS REFLEJAN QUE SÍ RECIBIÓ LOS BONOS.**

## II.

### A.

El auto de certiorari es el vehículo procesal extraordinario "que permite a un tribunal de mayor jerarquía revisar las

---

[23] *Íd*., págs. 1338-1339.

determinaciones de un tribunal inferior." *IG Builders et al. v. BBVAPR*, 185 DPR 307, 337-338 (2012); *Pueblo v. Díaz de León*, 176 DPR 913, 917 (2009); *García v. Padró*, 165 DPR 324, 334 (2005). Trata de un recurso discrecional, para el cual existen unos parámetros que sirven de guía al momento de decidir si debemos expedir o denegar el auto. De esta forma, el asunto que se nos plantee en el recurso de *certiorari* debe tener cabida dentro de alguna de las materias reconocidas en la Regla 52.1 de Procedimiento Civil, *supra,* R. 52.1.

La Regla 52.1 de Procedimiento Civil dispone que un recurso de certiorari sólo será expedido cuando se recurra de una resolución u orden bajo las Reglas 56 (Remedios Provisionales) y 57 (Injunctions) de Procedimiento Civil o una denegatoria de una moción de carácter dispositivo. Además de lo anterior, y a modo de excepción, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias cuando se recurra de decisiones sobre: 1) la admisibilidad de testigos de hecho o de peritos esenciales; 2) asuntos relativos a privilegios probatorios; 3) anotaciones de rebeldía; 4) casos de relaciones de familia; 5) casos que revistan interés público; o, 6) cualquier otra situación en la cual esperar la apelación constituiría un fracaso irremediable de la justicia.

Una vez adecuadamente presentado un recurso de certiorari, el Tribunal de Apelaciones deberá ejercer su discreción y evaluar la petición tomando en consideración los criterios enumerados en la Regla 40 del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40. Deberá evaluar:

> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

Aun así, cuando el Tribunal de Apelaciones determina, en su sana discreción, denegar la expedición de un recurso de certiorari, no tiene que fundamentar su determinación. Regla 52.1 de Procedimiento Civil, *supra*, R. 52.1.

**B.**

La sentencia sumaria es el mecanismo mediante el cual un tribunal puede resolver la totalidad de una reclamación, o sobre una controversia en particular de un caso, presentada sin tener que celebrar vista evidenciaria, basándose únicamente en la prueba documental presentada. Regla 36 de Procedimiento Civil, *supra*, R. 36. "Constituye un mecanismo que existe por su virtud de acelerar la tramitación de casos en los cuales no existen controversias sustanciales de hechos que requieran la celebración de un juicio en su fondo". J.A. Echevarría Vargas, *Procedimiento civil puertorriqueño*, 3ª ed. rev., Ponce, Ed. Nomos S.A., 2023, pág. 298. Es decir, permite que aquellas reclamaciones, sobre las cuales no existen controversias genuinas, sean resueltas con premura y eficiencia.

La Regla 36.2 de Procedimiento Civil, *supra*, R. 36.2 dispone que cuando la parte reclamada presenta una moción de sentencia sumaria, esta debe estar "fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes[...]". Presentada la moción, "la parte opositora tiene el peso de presentar evidencia

sustancial que apoye los hechos materiales que alega que están en controversia". *León Torres v. Rivera Lebrón*, 204 DPR 20, 44 (2020).

Ahora bien, debemos tener claros que el mecanismo de sentencia sumaria es un remedio discrecional extraordinario, "que únicamente se concederá cuando la evidencia que se presente con la moción establezca con claridad —es decir, preponderantemente— la existencia de un derecho, de manera que sólo procederá en casos claros, cuando el Tribunal tenga ante sí la verdad sobre todos los hechos pertinentes". *Jusino et als. v. Walgreens*, 155 DPR 560, 578 (2001). No será apropiado utilizar la vía sumaria para resolver controversias en las que hay elementos subjetivos de intención, propósitos mentales o negligencias o cuando el factor de credibilidad sea esencial. *Íd.*, pág. 579. Por lo tanto, "[c]ualquier duda acerca de la existencia sobre los hechos medulares del caso deberá resolverse contra la parte que la solicita". R. Hernández Colón, 6ª ed. rev., San Juan, LexisNexis de Puerto Rico, Inc., 2017, pág. 317.

La determinación del foro de instancia, denegando o concediendo la moción de sentencia sumaria, podrá ser revisada por el Tribunal de Apelaciones, que se encuentra en las mismas condiciones que el foro primario al evaluar el expediente, por lo que su revisión es una *de novo. Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 118 (2015). En ese sentido, este Tribunal tiene la facultad de hacer las determinaciones de hechos, que a su juicio estime en controversia o incontrovertidos, según la prueba que obre en el expediente, sin merecerle deferencia a la determinación del Tribunal de Primera Instancia.

## C.

En el ámbito laboral, nos dicen los profesores Charles Zeno Santiago y Víctor M. Bermúdez Pérez que los "patrones de conducta discriminatorios chocan seriamente contra los principios y valores éticos y morales de la sociedad". C. Zeno Santiago & V.M. Bermúdez

Pérez, *Tratado de derecho del trabajo*, 1ª ed. rev., San Juan, Ed. SITUM, 2014, Tomo II, pág. 15. "Se hace asimismo imperativo legislar para dar una eficaz protección a los trabajadores contra discrímenes por razón de raza, color, religión, origen o condición social de los empleados o aspirantes a empleo". *Íd.*, pág. 43. En miras de extender dichas protecciones constitucionales al ámbito laboral, la Asamblea Legislativa aprobó la Ley Antidiscrimen de Puerto Rico, Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 LPRA sec. 146 *et seq.* (Ley Núm. 100). De manera clara y enfática, el Artículo 1 de la Ley Núm. 100 establece una prohibición en contra del discrimen por edad, sexo u origen nacional en el empleo. La Ley establece que todo patrono que despida, suspenda o discrimine contra un empleado por su edad, sexo u origen nacional:

> (a) Incurrirá en responsabilidad civil:
>
> (1) Por una suma igual al doble del importe de los daños que el acto haya causado al empleado o solicitante de empleo;
> (2) o por una suma no menor de quinientos dólares ($500) ni mayor de dos mil dólares ($2,000), a discreción del tribunal, si no se pudieren determinar daños pecuniarios;
> (3) o el doble de la cantidad de los daños ocasionados, si ésta fuere inferior a la suma de quinientos dólares ($500), e
>
> (b) incurrirá, además, en un delito menos grave y, convicto que fuere, será castigado con multa de hasta cinco mil dólares ($5,000), o cárcel por un término no mayor de noventa (90) días, o ambas penas, a discreción del tribunal.

Artículo 1, *Íd.*

Por su parte, el Artículo 3 de la Ley Núm. 100 establece una presunción controvertible, disponiendo que "[s]e presumirá que cualquiera de los actos mencionados en las secciones precedentes fue cometido en violación [del Artículo 1, entre otros,] de este título, cuando el mismo haya sido realizado sin justa causa. Esta

presunción será de carácter controvertible". Dicha presunción opera de la siguiente manera:

> [U]na vez presentada la demanda, le corresponde a la parte demandante en la vista en su fondo comenzar con la presentación de la prueba de sus alegaciones, antes de que la parte demandada venga obligada a rebatirla. Si la parte demandante no presenta prueba suficiente para sostener sus alegaciones, la parte demandada no tiene que defenderse, procede la desestimación de la demanda en esta etapa.
> [...]
> El peso de la prueba para establecer las bases de su reclamación le continúa correspondiendo inicialmente al empleado. **Éste tiene que comenzar presentando prueba que demuestre, primero, que hubo un despido o acto perjudicial**; segundo, que **éste se realizó sin justa causa**; y tercero, **algún hecho base que lo ubique dentro de la modalidad de discrimen bajo la cual reclama**. Una vez el empleado cumple con esta primera fase surge la presunción de discrimen del Art. 3. Es decir, **el empleado no tiene que probar el acto discriminatorio que es objeto de la presunción**.
> [...]
> [S]i el patrono decide defenderse, tiene varias alternativas. Éste puede presentar prueba que rebata la presunción de discrimen activada por el empleado; o puede optar por presentar prueba de que el despido fue justificado; o que no hubo tal despido; o que a pesar de haber habido un despido injustificado éste no fue discriminatorio.
>
> *S.L.G. Hernández-Beltrán v. TOLIC*, 151 DPR 754, 774-775 (2000). (Énfasis nuestro).

"Si el patrono no presenta prueba alguna en esta etapa, se considera que el empleado ha probado su caso de discrimen, por lo que sólo resta la presentación de la prueba sobre los daños". *Íd.*, pág. 775. De esta manera, el Tribunal Supremo pautó los elementos esenciales con los cuales un empleado debe cumplir para establecer un caso *prima facie* de discrimen. Estos son: (1) que hubo un despido o acción perjudicial; (2) que éste se realizó sin justa causa; y, (3) tiene que presentar evidencia indicativa de la modalidad de discrimen que se vincula a su despido. *Íd.*, pág. 776; *López Fantauzzi v. 100% Natural*, 181 DPR 92, 124 (2011); *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364, 389, esc. 44 (2001).

En el caso de una reclamación al amparo de la Ley Núm. 100, "es inevitable la necesidad de establecer la intención del patrono,

por lo que **el factor [de] credibilidad desempeña un papel importantísimo en el resultado de la reclamación**". C. Zeno Santiago & V.M. Bermúdez Pérez, *op. cit.*, pág. 344. (Énfasis nuestro).

**D.**

Nuestro ordenamiento estatutario castiga el despido sin justa causa. En nuestra jurisdicción, la Ley Núm. 80, *supra*, regula las circunstancias en que un patrono privado puede despedir a un empleado, así clasificando lo que constituiría un despido injustificado. Para esto, el Artículo 2 de la Ley 80 dispone que:

> Se entenderá por justa causa para el despido de un empleado aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:
> (a) Que el empleado incurra en un patrón de conducta impropia o desordenada.
> (b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.
> (c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
> (d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.
> (e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.
> **(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.**
> No se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por

éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada según la ley. En este último caso, el empleado así despedido tendrá derecho, además de cualquier otra adjudicación que correspondiere, a que se ordene su inmediata restitución en el empleo y a que se le compense por una cantidad igual a los salarios y beneficios dejados de percibir desde la fecha del despido hasta que un tribunal ordene la reposición en el empleo.

Artículo 2, *Íd.* (Énfasis nuestro).

Cónsono con anterior, el Tribunal Supremo ha "reiterado, en un sinnúmero de ocasiones, que bajo las disposiciones de la referida Ley Núm. 80 constituye justa causa para el despido aquella que tiene su origen, no ya en el libre arbitrio o capricho del patrono, sino aquella vinculada a la ordenada marcha y normal funcionamiento de la empresa en cuestión". *Díaz v. Wyndham Hotel Corp., supra*, págs. 376-377.

### III.

Al evaluar el caso *de novo*, resolvemos no expedir el recurso discrecional de *Certiorari* presentado por Emerson PR. Nuestro análisis de la prueba documental, argumentos de las partes y derecho aplicable nos lleva a la conclusión de que aún existen controversias de hechos pertinentes que no nos permite resolver el caso por la vía sumaria. Si bien es cierto que la Regla 52.1 de Procedimiento Civil, *supra*, R. 52.1, nos permite expedir el recurso al recurrir de la denegatoria de una moción dispositiva, al evaluarlo al amparo de los criterios de la Regla 40 del Tribunal de Apelaciones, *supra*, R. 40, no hemos sido presentados con razón para revocar o modificar la *Resolución* del TPI. No ha mediado prejuicio, parcialidad, abuso de discreción o error manifiesto de derecho que amerite nuestra intervención en estos momentos, por lo que procede devolver el caso al TPI para que continúe su trámite ordinario.

**IV.**

Por los fundamentos discutidos, denegamos expedir el auto de *Certiorari* y devolvemos el caso para la continuación de los procedimientos.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones